RUNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| S&W FOREST PRODUCTS LTD,<br><br>Plaintiff,<br><br>v.<br><br>CEDAR SHAKE & SHINGLE BUREAU, et al.,<br><br>Defendants. | CASE NO. C19-202 MJP<br><br>ORDER GRANTING PRELIMINARY INJUNCTION |

The above-entitled Court, having received and reviewed:

1. Plaintiff's Motion for Preliminary Injunction Against Defendant Cedar Shake & Shingle Bureau (Dkt. No. 9),

2. Cedar Shake & Shingle Bureau's Opposition to S&W Forest Products, Ltd.'s Motion for Preliminary Injunction and Motion to Strike [Amended] (Dkt. No. 35),

3. Plaintiff's Reply in Support of Motion for Preliminary Injunction Against Defendant Cedar Shake & Shingle Bureau (Dkt. No. 38),

1     4. Cedar Shake & Shingle Bureau's Surreply in Opposition to S&W Forest Products,

2         Ltd.'s Motion for Preliminary Injunction (Dkt. No. 51), and

all attached declarations and exhibits, relevant portions of the record, and having heard oral argument thereon, rules as follows:

IT IS ORDERED that the motion for preliminary injunction is GRANTED. Defendant Cedar Shake & Shingle Bureau is ordered to restore Plaintiff S& W Forest Products, Ltd.'s membership status to the status which prevailed before the termination announced on December 21, 2018.

## Background

Plaintiff S&W Forest Products, Ltd. ("S&W") is a 50-year-old, third generation cedar shake and shingle manufacturer which operates a mill in Maple Ridge, British Columbia. Defendant Cedar Shake & Shingle Bureau ("CS&SB") is a volunteer trade organization that controls and monitors the "Certi-Label" system of grading and certifying cedar shake and shingle products. The association is governed by a Membership Agreement and a set of bylaws which delineate the procedures for calling a meeting of the Board and of terminating its members. The other Defendants (Waldun Forest Products Ltd. ["Waldun"] and Anbrook Industries Ltd. ["Anbrook"]) are two of the larger manufacturer-members of CS&SB. Both sides acknowledge that the right to label shakes and shingles with the "Certi-Label" system is important to the building industry and to quality identification of the products sold.

Plaintiff was alleged to have offered for sale "Mill Grade" (low value) cedar shakes as "#2 shakes" with CS&SB S/Cut labels. Upon discovering the alleged mislabeling, the CS&SB Board of Directors convened an "emergency meeting," recused Plaintiff's representative, and voted to terminate Plaintiff's membership and its right to use Certi-Label labelling on its products.

Plaintiff had been suspended from the association twice before for labeling violations; following the most recent suspension (October 2016), it was warned that any further violations would result in immediate termination.

Plaintiff's lawsuit alleges causes of action for a conspiracy in restraint of trade and also breach of contract. S&W seeks preliminary injunctive relief restoring its membership in the association.

At oral argument, Plaintiff indicated to the Court that its first theory (conspiracy in restraint of trade) could not support the issuance of a preliminary injunction. The Court therefore limits itself to an analysis of request for injunctive relief in the context of Plaintiff's breach of contract claim.

## Discussion

**Request for Preliminary injunction**

The elements to be established prior to the issuance of injunctive relief are well-known:

1. Likelihood of success on the merits
2. Irreparable harm in the absence of the injunction
3. A balance of equities which favors the moving party
4. The existence of a public interest which favors the injunction

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

The Court must first turn to the parties' dispute concerning the nature of the relief requested. Plaintiff insists its request to be reinstated is best characterized as a "prohibitory" injunction, seeking to preserve the status quo and carrying a lower standard of proof. Defendant argues the injunction, asking the Court to *do* something rather than simply freeze events at the current status quo, is "mandatory." Mandatory injunctions are "particularly disfavored" and

subject to a higher standard of proof ("not granted unless extreme or very serious damage will result and… not issued in doubtful cases or where the injury complained of is capable of compensation in damages")(Anderson v. United States, 612 F.2d 1112, 1115 (9th Cir. 1980).)

The Court agrees with Plaintiff; although the injunction has an unquestionably "proactive" impact, it is most accurately described as "prohibitory." "Mandatory" injunctions go beyond preservation of the status quo; "prohibitory" injunctions are intended to preserve, not necessarily the status quo at the time of the request, but the *status quo ante litem*, defined as "the last uncontested status which preceded the pending controversy." GoTo.com, Inc. v. Walt Disney Co. 202 F.3d 1199, 1210 (9th Cir. 2000). Plaintiff's requested relief would restore the parties to the status prior to the contested termination vote, which is the *status quo ante litem*. The Court will analyze this motion under the standard for a "prohibitory" injunction.

    1. <u>Likelihood of success on the merits – Breach of contract claim</u>

The documents at issue in this claim are the CS&SB Manufacturing Membership Agreement and the CS&SB bylaws, which the Agreement incorporates in numerous places. (Dkt. No. 11, Decl. of M. Watkins, Exs. B and C.) There is no dispute that the Membership Agreement is a contract between the members. Plaintiff cites Washington case law that an organization's bylaws constitute a contract between the organization and its members. Rodruck v. Sand Point Maintenance Comm'n, 48 Wn.2d 565 (1956)("The bylaws, in effect, constitute a contract between the commission and its members.") Defendant does not contest this principle.

The Court approaches the analysis of the breach of contract claim on two levels: the specific terms of the contract and a more generalized analysis of Plaintiff's due process rights in this situation.

1    a. Terms of the contract

2       i.   Notice

By its own evidence, Defendant violated at least the written notice requirements of its own bylaws.[1] The only evidence of notice of the "termination meeting" is a declaration stating that "On December 19, 2018, Ms. Meeker [*chairperson of the Board*] convened a meeting of the Board of Directors of CSSB." (Dkt. No. 27, Decl. of Adkins, ¶ 44.) No evidence of written notice has been produced. At oral argument, counsel for CS&SB argued that the presence of the directors at the meeting constituted a waiver of the written notice requirement – the minutes of the meeting (Dkt. No. 28-15, Decl. of Christensen, Ex. N) contain no evidence of a waiver and Defendant's briefing contained no legal support for its position that simply appearing for the meeting acted as a waiver of the requirement. The Court finds that Defendants failed to adhere to ¶ 14 of the Membership Agreement.

       ii.   Recusal

On the day of the meeting, Plaintiff's representative (Ms. Hothi) received an email stating that, because the meeting concerned her employer, she was being "recused" from the meeting. (Dkt. No. 10, Decl. of Hothi, Ex. D.) There is no "recusal" provision in the bylaws; the "Conflict of Interest" provision in the Bylaws merely requires a Director with a conflict to notify the Board in advance of its meeting on any topic which involves such conflict.[2]

---

[1] 14.  Notices: All notices or permitted [*sic*] under this Agreement shall be in writing and shall be deemed given when (i) personally delivered, (ii) deposited in the United States registered or certified mail, postage prepaid and return receipt requested, or (iii) deposited with a nationally recognized overnight delivery service such as Federal Express or Airborne, addressed to a party at the address under its name on the signature page of this Agreement. (Dkt. No. 11-2, Membership Agreement, Membership Terms and Conditions, Decl. of M. Watkins, Ex. B.)

[2] **Article V. Section 12: Conflict of Interest.**
A "conflict-of-interest transaction" is a transaction with or affecting the Member or other business or organization in which a Director has a direct or indirect interest. If a conflict-of-interest

Plaintiff submitted (and Defendant cited) a "Conflict of Interest Policy" promulgated by the CS&SB Board independent of the Bylaws. (*See* Dkt. No. 10, Decl. of Hothi, Ex. A.) The document confuses as much as it clarifies. While it is clear that "[a] request for a conflict of interest determination may be initiated by any Officer, Director, Appointee, or Senior Staff Member,"[3] the policy states further that such a request shall be made in writing. (Id. at 2.) No evidence of a such a writing was submitted. Additionally, "[o]nce disclosure of an actual or perceived conflict of interest situation is received, a determination is made by the Chairman and the Director of Operations." (Id.) The minutes simply reflect that "Ms. Christensen [*CS&SB Director of Operations*] announced that Director Sanji Hothi was recused from the meeting because the subject of discussion was whether to terminate her employer's, S&W's, CSSB membership." (Decl. of Christensen, Ex. N at 2.)

There is no indication that the matter (which was more than a simple "conflict of interest" determination) was put to a vote or that Ms. Hothi was given an opportunity to state her or her company's position prior to the decision. The Bylaws contain no definition of "recusal" nor any process by which "recusal" is determined or carried out. "Recusal" means "to disqualify (oneself) as a judge in a particular case" (https://www.merriam-webster.com/dictionary/recusal); i.e., to remove oneself from decision-making, not from being present and offering evidence or opinion – effectively banishment – as was the case here. The "conflict of interest" determination

---

transaction is proposed or contemplated by the Board, any Director having a potential conflict shall disclose to the Board all material facts known to such Director and such Director's interest in the transaction. The transaction then may be approved by a majority of the Board comprised of Directors who have no direct or indirect interest in the transaction. (Dkt. No. 11-3, Bylaws of the Cedar Shake & Shingle Bureau, Decl. of M. Watkings, Ex. C.)

[3] The Court notes that the Conflict of Interest Policy – which allows "any Officer, Director, Appointee, or Senior Staff Member" to initiate a conflict inquiry – goes beyond the Bylaws, which appear to limit initiation of the process to "self-reporting" by the Director with the conflict. But it is not a significant distinction in light of the fact that, the conflict inquiry was clearly not initiated in writing as required.

was apparently reached by the Chairperson of the Board alone, a clear violation of the Conflict of Interest Policy. The "recusal" process itself has no foundation in the Membership Agreement or the Bylaws.

    b. <u>Due process</u>

Neither party cited to any provisions in the Membership Agreement or the Bylaws for a "hearing" when a termination is being contemplated, leaving Plaintiff to argue from precedent about whether it was owed some kind of hearing (with accompanying due process) when CS&SB was deliberating whether to remove the company from the association.

The question of whether an association member is owed some form of due process in a termination proceeding turns on whether the affected party can identify a "property interest" in its membership which cannot be withdrawn without observing due process requirements. (*See* <u>Anderson v. Enterprise Lodge No. 2</u>, 80 Wn.App. 41, 46-47 (1995))(disputes within voluntary associations are judicially cognizable when they involve property rights of members.)

Plaintiff identifies the right to use the Certi-Label labels as "a highly valuable property interest" and cites business losses (both recent and projected) as proof of the value of that interest. (Decl. of M. Watkins, ¶¶ 5, 29-30.) Defendant points to the language of the Membership Agreement which states that no member "has the right to use the Marks except with the permission of the [CSSB]," and "will acquire no interest in or right to use the Marks, other than that granted herein." (Membership Agreement, Ex. B at 2.) At oral argument, defense counsel asserted that inappropriate use of the Mark damages the organization's reputation and integrity. The Court finds that, at this stage of the proceeding, Plaintiff has produced sufficient evidence to establish that a property right in the use of the Mark likely exists, and therefore its due process rights are triggered by any threat to its right to use the Mark.

It is the finding of this Court, that, on the basis of the evidence cited above, Plaintiff has a high likelihood of prevailing on the merits of its "breach of contract" claim, as to violations of the terms of its agreements with CS&SB and/or violations of its due process rights stemming from its property interest in the use of the "Certi-Label" mark. Plaintiff also contests whether the CS&SB Board had <u>grounds</u> to terminate its membership for a violation of the association's agreement.[4] The issue of whether the grounds stated by the Board (the mislabeling of cedar shakes) were accurate or adequate is clearly not a straightforward one, and the Court makes no comment on the likelihood of success if the issue is revisited by the Board in a future proceeding. In light of the finding that Plaintiff has established a likelihood of succeeding on at least a portion of its contractual breach claim (compliance with the Membership Agreement and Bylaws), a further finding is not necessary at this point.

    2. <u>Irreparable harm</u>

Defendant attacks Plaintiff's evidence of "irreparable harm" because of its lack of corroboration by way of either financial records or expert witnesses. The evidence presented by Plaintiff's President, a third-generation shake and shingle manufacturer who has been running the company since 2011, is sufficient for purposes of this injunctive analysis. (Decl. of Michael Watkins at ¶¶ 5, 29-30.) The points made by the Michael Watkins declaration relative to the danger faced by the company as a non-member of CS&SB can be summarized as follows:

    1. Without the Certi-Label endorsement, the company will be forced to sell its products at lower prices (the declarant estimates "15%-25%").

---

[4] Article III, § 5(a)(iii) of the Bylaws states that termination may be imposed "for the Member's failure to comply with these Bylaws, its Member Agreement, or any of the policies, procedures, rules and regulations adopted by resolution of CSSB Members or the Board of Directors…, or for conduct detrimental to CSSB or its Members." (Decl. of M. Watkins, Ex. C at 6.)

2. The material from which these discounted products were made was purchased at prices which assumed that the products would be "Certi-Labelled," further cutting into Plaintiff's profit from its sales.

3. As a non-member of CS&SB, Plaintiff will have difficulty competing in the raw materials market against CS&SB member companies which can pay a higher price for the raw cedar because they can charge a higher price for the "Certi-Labelled" shakes and shingles.

Id. Plaintiff's president estimates, on the basis of the above factors, that the company will be shut down by mid-May 2019 if it is not reinstated in CS&SB. (Id. at ¶ 5.)

Plaintiff's assertions are logically and intuitively sound, based on extensive experience in the industry. The Court is unpersuaded by Defendant's argument that Plaintiff can survive as a non-Certi-Label manufacturer simply because there are other companies that are doing so – it is overly simplistic, even unrealistic, to expect a company which has over decades developed its business model based on certain expectations of the prices it can pay for raw materials and charge for its products to suddenly pivot and become a player in the lower-end portion of the market. The figures and estimates provided by Plaintiff's President based on his and his company's long-term experience in the cedar shake and shingle industry are more than speculative and compel a conclusion of irreparable harm, in the sense that it will drive them out of business – a loss which cannot be compensated by mere money damages. (*See* Foremost Int'l Tours, Inc. v. Qantas Airways Ltd. 379 F.Supp. 88, 97 (D.Haw. 1974)(*aff'd* 525 F.2d 281 (9th Cir. 1975)(*cert. denied*, 429 U.S. 806 (1976))("The threat of being driven out of business is sufficient to establish irreparable harm.")

1       3. <u>Balance of equities</u>

The balance of equities favor Plaintiff. Defendant complains that being forced to "take back" Plaintiff into its ranks would put it in the position of "endorsing" its allegedly fraudulent behavior and would send a very negative signal to its market. It is not a persuasive position – firstly, as a member of CS&SB, Plaintiff would be subject to the organization's strict and ongoing scrutiny and (since CS&SB amended its labeling protocols in the wake of the precipitating incident here) the likelihood of a repeat of the problem which resulted in Plaintiff's termination is extremely small.

Additionally, there appears to be no obstacle to CS&SB revisiting the issue of Plaintiff's termination from the organization, this time in compliance with its Membership Agreement and Bylaws and in conformity with the requirements of due process. Lastly, in a situation where Defendant is being ordered to involuntarily reinstate a terminated member, the Court assigns little weight to Defendant's claim that the reinstatement will somehow be seen as an "endorsement" by CS&SB of Plaintiff's alleged misbehavior.

Other than the time and expense entailed by further termination proceedings, the Court sees nothing inequitable in requiring CS&SB to reinstate Plaintiff, and considerable inequity for Plaintiff if its request for injunctive relief is not granted. The balance of equities favors the moving party here.

      4. <u>Public interest</u>

Finally, the Court finds that a grant of this injunction is in the public interest. Defendant does not controvert Plaintiff's representation that the manufacturing jobs it represents are a cornerstone of the economy in its locality. Accepting for purposes of this motion Plaintiff's representation that the future of the company is in jeopardy without this injunctive relief, the

public interest in preserving those jobs is clear. Likewise, the public interest in a strong and competitive market is served by permitting as many similarly-situated companies as possible to work together in the kind of voluntary association represented by CS&SB to create a trustworthy, self-regulated industry.

Plaintiff represents, in its reply brief, that "CS&SB does not dispute that if an injunction issues, bond should be waived or nominal." In fact, while Defendant did not respond to Plaintiff's request that bond be minimal or entirely waived, it does have a position concerning the imposition of some form of financial guarantee. Counsel for CS&SB placed her client's estimate of the bond required to "protect" CS&SB from the danger of further recurrence of their perceived problem at $250,000 to $500,000.

The Court does not agree. With the guidelines concerning the issue which brought the parties before this Court now clarified, and Plaintiff on notice that its practices will be subject to ongoing scrutiny, CS&SB is at little risk of incurring any loss to its reputation or integrity by reinstating Plaintiff to its ranks. The Court waives the posting of any bond in this matter during the pendency of the litigation.

**Motion to strike/surreply motion to strike**

Defendant made two motions to strike. First, in its response brief, CS&SB points out that Plaintiff's declarations were not signed "under penalty of perjury," a technical oversight which Plaintiff corrects in its reply brief, and the Court considers non-serious. Defendant also alleges multiple instances of hearsay in all of Plaintiff's initial declarations. Regarding those allegations, the Court rules as follows:

- Hothi Dec. (Dkt. 10), ¶ : describing alleged views of separate companies and alleged statements made by unidentified third parties describing alleged comments made by Curtis Walker and Brooke Meeker. Motion to strike granted: STRICKEN.

- Martin Dec. (Dkt. 13), ¶ 2: describing alleged statements made by Colin Forman to the declarant. Motion to strike granted: STRICKEN.

- Taylor Dec. (Dkt. 16), ¶ 5: describing alleged statements made at an unknown month and year by Stuart Dziedzic to the declarant, describing alleged statements made to Mr. Dziedzic by an unknown third-party, purportedly either Brooke Meeker or Curtis Walker. Motion to strike granted: STRICKEN.

- Rourke Dec. (Dkt. 12), ¶ 3: describing alleged statements made by Dave Mooney "sometime in the early 2000s" to the declarant; ¶¶ 5-6 (hearsay describing alleged statements made by Terry Adkins to the declarant. Motion to strike granted: STRICKEN.

- K. Watkins Dec. (Dkt. 15), ¶¶ 3-4: describing alleged statements made by Curtis Walker to the declarant. No foundation laid for any hearsay exception. Motion to strike granted: STRICKEN.

- M. Watkins Dec. (Dkt. 11), ¶ 13: describing alleged statements made by Bill Maitland to the declarant, which described alleged statements made to Mr. Maitland by Curtis Walker; ¶¶ 23-24: describing alleged statements made by unidentified third parties to the declarant which described statements made to unidentified third parties by Curtis Walker. No foundation laid for any hearsay exception. Motion to strike granted: STRICKEN.

Defendant's surreply raises further serious issues. Attached to Plaintiff's reply brief were five new declarations – three "second declarations" from previous witnesses, and two new witness declarations (including an "agricultural economist expert" who offers expert opinion on the economic effect of Plaintiff's exclusion from CS&SB; Dkt. No. 41, Decl. of Sexton). The Court agrees with Defendant – all of these submissions represent, new argument which Plaintiff could have (but did not) present in its opening briefing which is improper in a reply brief. It is not permissible to raise new arguments or present new evidence in a reply brief. <u>United States v. Puerta</u>, 982 F.2d 127 1300 n.1 (9th Cir. 1992).

The surreply motion to strike Plaintiff's new reply declarations is GRANTED. The Court did not consider any of that evidence in arriving at its decision.

## **Conclusion**

Plaintiff has succeeded in demonstrating a likelihood of success on the merits on its breach of contract claim, the existence of irreparable injuries should relief not be granted, a balance of equities which favors its position, and a public interest in achieving this form of relief. On that basis, the Court will grant its request for prohibitory injunctive relief and order CS&SB to reinstate it to membership.

This order does not prohibit Defendant CS&SB from further action regarding the labeling controversy underlying this lawsuit, provided it is undertaken in compliance with the Membership Agreement and the Bylaws and comports with the requirements of due process.

The posting of bond is hereby waived.

The clerk is ordered to provide copies of this order to all counsel.

Dated April 3, 2019.

*[signature]*
Marsha J. Pechman
United States Senior District Judge